Case number 14-5074, Susan M Morris Appellate versus Gina McCarthy, Administrator, US Environmental Protection Agency. Ms. Bernard for the appellant, Mr. Hooda for the appellee. Mr. Hooda for the appellate, Mr. Hooda for the appellate, Mr. Hooda for the appellate, Ms. McCarthy for the appellate, Ms. McCarthy for the appellate. Good morning again. Good morning. You drew the short straw and hit me twice in a short period of time. My pleasure. May it please the Court, Ellen Rayno for the plaintiff appellant, Susan Morris. The district court's decision on both claims need to be reversed. The termination claim, the decision to dismiss that claim was an error because if you look at the statutory language, Ms. Morris satisfied the requirement. She filed her appeal with the MSPB in September. However, she did not file this civil action until April, and that was well, April of 2011. And that was well more than the 120 days that she is required to give them to reach a decision. But she requested the delay here, right? That's what's different. She didn't. She requested that the MSPB hold things up, right? She requested a stay. The agency wanted the dismissal without prejudice. So by requesting a stay, if the MSPB, if the board had simply stayed the case, her claim would have been right to go forward to court because it would have been... So you say the stay doesn't affect the 120-day period? I'm sorry? The stay doesn't toll the clock there? No, no. If she asked for the stay, they gave her the stay, and then she walked away, you would say she could still go file suit within 120 days? Yes, yes. She wouldn't be abandoning the very process she asked to put on hold? I don't think that would be abandoning, no. No. Asking for a stay... I mean, the idea here is she's supposed to be pursuing her claim before the administrative agency, right? And when she asks for a stay, she's saying, I'm not pursuing that claim right now, right? Actually, she didn't initiate the request for the stay. It was the Office of Special Counsel. But when it was for the MSPB decision-maker, she had reservations which she expressed, but none of those reservations went to the question of the effect of this on the 120-day rule. No, but it went... She wanted to be sure that her claim would be revived, understandably, of course. Actually, what she said was that she wanted to make sure none of her rights were prejudiced, and the administrative judge assured her that this stay... I'm sorry, it wasn't a stay, what they did. Dismissal without prejudice and an automatic refiling would not affect her rights. Now, the appellee is arguing that that initial dismissal without prejudice was a decision that she could have gone to court on, and we know that's not true. That was not a final decision. She could not have come to the district court based on a dismissal without prejudice. She needed to wait longer, and she did do that. That's sort of almost a metaphysical issue to me. There's something more basic here, and that is the principle of exhaustion here is that she's supposed to bring this claim before the board, right, before she can bring it to district court. And she brought the claim and then agreed to stop, to hold off. To hold off, but that's not abandonment, Your Honor. If you look at the cases on abandonment, it's much more serious than that. It's completely abandonment. The abandonment is when she later filed in district court, right? She didn't abandon. She asked that they just hold up while the OSC decides. She did not say, you know, I'm taking this case away and you can't have it anymore. She said she agreed to a dismissal. She agreed reluctantly. She said that if she preferred to stay because she was worried about her rights being affected, and she agreed if the administrative judge would provide assurance that her rights would not be affected. It wasn't any rights. It was the right to seek relief in the event the matter is not resolved at the conclusion of OSC's investigation, which hadn't happened yet by the time she filed suit. I'm not understanding your interpretation of that. She's asking. So she doesn't say, I don't want a dismissal without prejudice. If you're going to do a dismissal without prejudice, say it's not without. It has to not impact my ability to go to court when I think it's time to go to court. Instead, she said the only thing she was concerned about was not waiving her right to seek relief. I'm quoting the ALJ quoting your brief that says she's not waiving any right to seek relief in the event that the matter is not resolved at the conclusion of OSC's investigation. So what exactly was she wanting to have preserved there? There's another part of her attorney's response that says that she wants to ensure that her appeal remains timely under the applicable statute of limitations. These procedures are designed for the layperson. But that was talking about her appeal to the MSPB, right? Yes. Okay. Yes. And so they dealt with that with their automatic refiling. These procedures were designed for the layperson to be able to navigate. Here she had experienced counsel. It was not our firm, but it was another experienced litigation firm. And the MSPB then made it completely arbitrary to dismiss without prejudice rather than just staying the appeal, which is what she requested. They say they don't have any authority to stay cases because Congress has said 120 days. So in effect, what the judge was doing was trying to stay the case by dismissing it without prejudice and then having an automatic refiling of that same appeal. The bottom line is if you just look at the statute, she filed her case and more than 120 days passed. But in the statute, there's these other doctrines about abandonment and equitable estoppel. Why wouldn't that apply? The case is on abandonment. Why is she not equitably estopped? The quote is that she agreed to dismissal without prejudice. Why does that not equitably estop her then from walking away from the administrative process? I don't think she agreed. She said Ms. Morris requests that this board stay the proceedings rather than dismiss the case without prejudice to refiling. And then she says if the board is going to dismiss, if the board decides that's the best course, then I want assurances. And they gave her assurances. Assurances of what? That she could come back to the board. But does she have to think of every contingency when she's asking for assurances? I mean, she's saying I don't want this to prejudice my rights. You stress very strongly in your brief, understandably, it is a concern, the risk that the MSPB will drag its feet. But we don't have any sign at all of that here. We have the MSPB holding operations on her claim for a good reason, which she shares. And then there's an automatic refiling, and it picks it up again. And there's no indication of its dragging its feet in that period. In any event, the 120-day rule would protect her. So I guess I'm at a loss to see what interest of hers is sacrificed here. Well, she didn't initiate the request. The brief that was submitted, the motion to stay proceedings, is a response to the judge's request for a response. Proposing that the MSPB dismiss without prejudice. At what point did she ask for the board to stay its proceedings? Was it before the agency asked for this dismissal without prejudice? Who went to the board, or did the board do it on its own? I'm trying to find the courts. Because the MSPB says in its order, it's a request. I'm sorry, I'm not finding the October 14. So what I have is OSC asked for a 45-day stay of the removal action. But I thought that was just the agency not removing her. And then the ALJ on its own says, I want to hear from the parties. Tell me if I'm wrong. This is why I got it. Whether we should go forward with this hearing or not. And both parties have responded. I assume was that simultaneously? Well, but what was the MSPB's initiation of the discussion? Right, so they say, look, we've got this OSC thing going on. Let me ask both parties, what do you want to do with this hearing that we're supposed to have? And the agency came back and said dismiss without prejudice. And your client came back and said, I'd like a stay, which simply isn't something that they have to offer procedurally unless it's for settlement. So they just couldn't do a stay. But she did not want to go forward with the scheduled hearing, because the OSC could have resolved everything. But she didn't initiate that request, and that's my point. It was the MSPB who – Why does initiation matter if an adjudicator says – if we say to you, look, we hear there's an agency proceeding going on. Is there any sense in going forward with oral argument? Parties, please let us know whether you think we should go forward with oral argument. And one side comes in and says, no, you shouldn't go forward with oral argument. And then your client comes in and says, no, you shouldn't go forward with oral argument. Why does it matter that we ask the question first, that the adjudicator asks the question first? Because when you're looking at abandonment, you have to look at the complainant's actions and her intent. And her intent was not to abandon her MSPB claim. Her intent was to go forward with it, waiting until the OSC completed their investigation. But she didn't do that. She went before OSC was done, and she went to court. Well, and that's part of the problem. Everything was taking so long, and that is what – MSPB wasn't taking so long. It did exactly what she said. Don't go forward with – I think it was at an October hearing. Don't go forward with it. She wanted it to be labeled a stay. They wanted it to be called a dismissal without prejudice. The ALJ came up with this combination thing, dismissal with prejudice with automatic refiling. But she didn't want that October hearing. That's really not what she says in that response to the MSPB. She wanted a stay. She – but she's saying she prefers a stay to a dismissal without prejudice. She's not initiating an action where she's requesting that they delay the proceeding. The MSPB was already inclined to delay. They said, should we go forward with this hearing? Then her answer should have been, yes, let's go forward with this hearing. She could have said, yes, let's go forward with this hearing. But my point is that she's just agreeing with what the MSPB is proposing. She's not saying I'm – she's not doing anything overt to abandon her. MSPB didn't propose anything. It said, just tell us what you guys want to do about this hearing. One answer which could have been, let's go forward. I'm in a hurry. This is my job. But I don't think not saying I'm in a hurry and not saying let's go forward is the equivalent of abandonment. And I think the case – No one's saying that. What we're saying is when she came back and said, I don't want that hearing. Let's put things on hold. And that's what the agency does. So what doctrine does that come under that obviates the need for the 120-day rule? I mean, what – there's – the statute says you have to file a 120-day re-edit decision. This is a tribe that can be subject to equitable estoppel. Why wouldn't equitable estoppel apply here? I don't believe it applies in this case. The doctrines in the case law are just the abandonment. And she did not abandon her case. She merely agreed to let it stay on hold. Why didn't she abandon her case when she filed in the district court before the 120-day period ran? It was after the 120-day period when she filed in court. It was April. It was from September to April. That's seven months. It was a period of time when the clock wasn't running, I'm assuming, at her agreement. At her agreement, but not at her request. And I believe her – Well, it's certainly consistent with her desire. But anyway, you made that point. Okay. Moving on to the suspension claim, if you'll just give me a few moments to talk about that, the district court's summary judgment needs to be reversed because there are issues of fact from which a reasonable jury could find that the real reason – How is the issue sheet not a response? Because it's not addressed to the employee. Does a response – response means that? Response means it has to be – That's one reason, yes. Where do we get that from? Is that a dictionary understanding? When you talk to me and – That's a response. And I respond back. It's a response. That's one form of response. But if I talk to someone over here, I don't – Is that exhaustive of the responses? No. If I talk to somebody over here, it's not a response to you. So that's your answer. It's not a response because it wasn't directed to – That's one reason. Okay. A second reason is that it doesn't respond to the specific accusations that were in that memo. The reason she ordered her not to respond was because she didn't want her to engage any further with that employee. She didn't engage any further with that employee. She didn't address what was said in that memo. Her issue sheet has to do with a fundamental problem at the EPA that non-civil rights professionals, environmental lawyers, were trying to dictate policy in civil rights areas, including asking for affirmative action for gays and lesbians, when that is clearly not allowed under the law, when there's been no showing. Does your client – I understand your client's view that this did not violate the directive not to respond. She has a different view of what she was doing. Do you factually dispute that Higginbotham thought it was a response? Yes, we do. What evidence did you come forward with that would have allowed a jury to conclude that she didn't even think it was a response? Because she is all over the place. She has said – She's all over the place on, I didn't think this was a response. Not on why I hadn't done my own response earlier. That's got nothing to do with this. Well, that has something to do with it. That's material. Why is she all over the map just on, I didn't think this was a response? Where did she ever say, I didn't actually think this was a response? Or what evidence – Well, you never have that in a discrimination case. Okay, so what evidence do you have as to her thinking that this was not a response? We have her racially biased statements that show that she has a personal hostility towards Ms. Morris. And one of the standards on pretext is if a reasonable jury could believe that a discriminatory reason more likely motivated the employer. So the pretext evidence, the evidence that it's just not plausible that this is a response, has to be weighed and weighed by a jury along with the evidence of racial discrimination. Do you have other evidence? And also her dishonesty about – it's material. For five months she didn't respond to this memo that she agreed was not accurate towards her employee that was widely distributed. She didn't respond. Five months went by and she didn't try to do anything to clear Ms. Morris' name. So Ms. Morris did respond, right? No, she didn't respond. All right. What she does is she takes Ms. Higginbotham to task for saying she would respond and then not responding. And that is not a response to what is said in the memo from Ms. Tamelia. Those are the two things you rely on are the comments, the racial comments, and her delay in responding herself. Is there other stuff? No, there's many more things. Okay. There's the fact that she is dishonest about the delay. She makes up some – I said those two things, the delay and the comments. But if she's dishonest about material facts that affected Ms. Morris, from that a jury can see – I'm just asking you are there other things that you have. Well, you said just the delay, but it's not just the delay. I said the delay and the racial comments. It's that she lied about the delay. The delay and the racial comments. The delay and the racial comments, yes. Also the fact that she treated her horribly. She didn't give her the respect that she gave her African-American directors. The supervisor, Spears, had actually said to her at one point when she hired a white person, why are you hiring so many white people in the Office of Civil Rights? Aren't people going to think that's odd? What year was that? That was the year before the suspension. How do we know that? We know that it was the time of the hiring of Haig. That was the only event that I could see that at least if you knew when Haig – I don't know. How many years does it take for a racist to change their views? That's an interesting question. It was in the timeframe. It was not 10 years earlier or anything like that because it was at the time of Administrator Johnson. That was another comment she made. Administrator Johnson goes back to early 25, so that's a substantial period back. Okay. Well, yes, I'll give you that. So all I'm saying is that you'd be much more probative, I think, if it were a month before the Spears decision than if it is three and a quarter years before the Spears decision. You wouldn't concede that. No, I don't concede that. I don't concede that. I don't think that somebody who calls white people who are working nasty little white boys – That's different. Now we're talking about Higginbotham. I don't think that a person who speaks like that changes their views in four years, regardless – unless something else intervened, and it would be their burden to show that their views on race have changed. Before this whole – so in that period between that statement and then this whole response thing arose, what did she do that suggested she was racially discriminated against more? I'm trying to get the window between your nasty – I think it's nasty white boys comment and the start of this whole – when your client sent the issue sheet. Or even when you want to say when this whole thing, this whole dispute arose and the delay started. Well, the – What happened in between there? You've got like a year period, right? Well, the only thing she knows for sure is that it was Administrator Johnson who – the white men were working outside of Administrator Johnson's office, and she didn't recall exactly when that was. We could look up at some point when Administrator Johnson had renovations done, but that had to be at least February – January, February 2005. But it's unlikely that it was that early. I'm just asking you what happened between the time period when that statement occurred and when this dispute with – I don't know if I'm saying the name right – Tomelio arose. There's a time period there that I'm interested in knowing how Higginbotham displayed discrimination against your client. Well, the – Are there any actions that you point to? Because I think that's one of the reasons time matters. I'm not prepared to answer that right now. Okay, because that's why I think time matters is there's a lot of intervening activity. Okay, but she did – I believe there are parts of at least one of her declarations where she talks about ongoing strife between her and Ms. Higginbotham, and there was constant disfavorment. Yeah, I'm not sure that helps, though, unless we know why. She regularly favored her African-American employees. She went to lunch only with her African-American assistant directors. She basically treated Ms. Morris as an outcast from the beginning. And it was to a least right – Was Ms. Morris the only white woman in the office? Yes, yes. Everyone is black except, at this time, Ms. Morris and Bill Hague, who when he was hired it was said, why are you hiring so many white people? What's the total number of people in the office? I am not sure. There are four assistant directors, and then under them – Ms. Morris herself had about five people working for her. Well, but I'm thinking of people at or above her level. Maybe there's no one above her except for Higginbotham herself. Right. In other words, I'm trying to picture the pyramid we're dealing with. Oh, I wonder if I have a – There's a workforce analysis in here. Oh, that doesn't help. Sorry. Statistics of the whole EPA. But it's not just the assistant directors that are all African-American. The people under them are all African-American as well. So the people that are being hired in the Office of Civil Rights are not white. Remind me what year Mr. Hague was hired. I'm sorry? What year was Mr. Hague hired? Just remind me. I don't know. I can get all these dates for you if you would like. We can find them. I just didn't know if you knew off the top of your head because it – I'm not sure it's in here. I couldn't find the date of H.P. Higginbotham.  I could not find the date of H.P. Higginbotham. You couldn't find it? Yeah, but I could ask Ms. Morris and she would know. Or at least she would know a general timeframe. But it was definitely before the suspension in 2007. I think in closing, the issue is when you take all the evidence together, whether there's enough evidence for a reasonable person to think that it was discriminatory. And given the very racial things that Ms. Higginbotham has said, I don't think that those kind of motives dissipate over time, especially when she's the entire time antagonizing Ms. Morris. And if you look at her – We have your argument. We'll give you a couple minutes back. Okay, thank you. Thank you very much. Your Honors, may it please the Court. Brian Hudak from the U.S. Attorney's Office on behalf of the EPA. The EPA asked this Court to affirm the District Court's decisions to dismiss Ms. Morris's termination claim and grant its summary judgment on Ms. Morris's suspension claim. First, as to the termination claim, as the panel has noted in the appellant's argument, there's an overarching obligation to actively participate in the administrative process. This is because the whole concept of administrative exhaustion is there to encourage the parties to resolve their disputes without resorting to litigation. But ALJ was wrong to say that she agreed to dismissal without prejudice, right? I disagree with that. Her filing nowhere says – where does her filing say she agreed to dismissal without prejudice? I didn't see that anywhere. I thought you said, look, I want to stay. I don't want to dismissal. I want to stay. If you decide that's what you're going to do, protect me. But I see nowhere where she agrees to it. I don't believe she uses the word agree, but the last paragraph of her response to AJ's order is, however, if this Board believes that the best course is to dismiss the matter without prejudice – No, that's just saying, look, lawyers do this all the time. Boy, I don't think you should do that. But if you're going to rule against me, let's mitigate the harm. I don't see her agreement anywhere to dismissal without prejudice. And if she didn't agree, isn't that pretty important? Your Honor, I think there is a fair reading of this that the AJ understood her argument. Well, this is summary judgment, so we're going to take it in the light most favorable to her. It's your burden to show that. And you have to show abandonment, right? The burden is on you to show failure to exhaust. And so if it's unclear whether she agreed – and I don't think it's unclear, actually. Well, Your Honor, whether she agreed or not, it was dismissed without prejudice. She wanted to delay the process to allow the OSC investigation to continue for a very important reason. The OSC had asked the MSPB to stay the effectiveness of her removal. She was continuing to be an employee and being paid by EPA during this period of time. Yeah, exactly. And then in January, she was fired for good. That stay ran out. And meanwhile, never wanted to restart the clock again. Well, once that stay runs out, she really wants to push this thing forward. And maybe that's why she didn't agree to dismiss without prejudice. She wanted more control through the stay. Well, Your Honor, that's contrary – And automatic refiling where she doesn't pick the date. Well, Your Honor, that's contrary to her actions in the second MSPB appeal. If the court were to consult Appellee's addendum at page 28, we have a motion to stay by Ms. Morris in the second appeal. Or in the alternative, to hold it in abeyance pending outcome of the investigation by OSC. Even in the second appeal, she was wanting to delay her MSPB appeal until OSC can finish its review. Which page are you on? I'm at page 28 of the addendum to Appellee's brief. Which page? I'm sorry, tell me again. I've been referring to it as AD 28 to AD 30 is a motion filed by Ms. Morris in the second MSPB appeal, seeking a further stay of the MSPB proceedings for OSC to finish their investigation. At this point in time, she was terminated. The MSPB did not grant a further stay of the effectiveness of her removal. But she was still waiting, wanting, desiring for OSC to finish its investigation before she moved forward with her appeal. So the notion that she was eager in her second MSPB appeal to get it going and have it finished within 120 days is simply not there. When the MSPB denied her motion to stay in the second MSPB appeal, that's when she went to district court. Perhaps viewing the MSPB's reluctance to delay proceedings as an indication that it was an unfavorable forum for the merits of her dispute. But whatever the reason, it's not as if she was eager to pursue her MSPB remedies at that point in time. Indeed, the MSPB, despite a 30-day stay for discussions of settlement, and despite Ms. Morris's motion which was denied for a further stay, the MSPB was on track, pursuant to its orders, to conclude its consideration of the MSPB appeal within 120 days of the refile date. It was on pace to adhere to its statutory mandate, and it was only Ms. Morris who prevented that from occurring by filing her claim. Do you have authority that suggests the MSPB can, in fact, toll the clock this way? That a stay can toll the clock? Yeah. Your Honor, I think- The statute speaks about 120 days or so. I don't see any exceptions for that. It's, I think, two responses. One, Your Honor, is the Ninth Circuit in Vinicius Eros. I think you can draw some support from that case where it applied equitable notions to the consideration of the 120-day period, saying if someone abandons the process, if someone's case is dismissed without prejudice, they can't simply clock it. They can't simply wait for the lapse of 120 days. The Ninth Circuit is it. That's it. That's all you've got. Your Honor, it's that and also the government's position that the dismissal without prejudice was a final decision subject to judicial review under the statute. Those are the two propositions that we would offer for the fact that this dismissal without prejudice rendered a nullity the time of the first MSPB appeal because the second MSPB bill was filed and was on process and the parties actively engaged in the administrative process during that period of time and it was aborted only because Ms. Morris chose to go to district court. As to the suspension claim, Your Honor, I do not believe that there is any reasonable juror that could find that Ms. Higginbotham doubt reasonably and sincerely believed that the issue sheet was in subordination. She sent an email, which is located in Joint Appendix, page 387, on February 14th, as soon as she received Ms. Morris' issue sheet, saying, I specifically told you not to respond. This is a response. I'm going to have to consider what to do. And at that point in time, the steps in her proposed suspension, which ultimately led to her suspension, followed shortly thereafter. There is no reasonable inference from the record that Ms. Higginbotham's decision to propose Ms. Morris' suspension and Mr. Spears' decision to affect that suspension after hearing from Ms. Morris and her counsel was not motivated by this reason but some other reason. And that is the threshold showing that Ms. Morris must shift. But what do you make of your opponent's argument that this, in fact, was not a response because it wasn't directed to the memo's authors? Well, as an objective basis, it's a human resources complaint, right? Well, no, Your Honor. A human resources complaint by OCR employee does not need to be sent to 27 senior EPA management officials, including recipients of the critical memoranda that are referenced in her issue sheet. I mean, her issue sheet references, calls out, points out these memorandums. But is it unreasonable to think that this wasn't a response? Perhaps it was a response to Ms. Higginbotham, but not a response to the memos. Well, Your Honor, it's not whether it's reasonable to view this objectively as a response or not. The question is, under Brady, whether there is a reason in the record to question Ms. Higginbotham's belief that it is. Your Honor, don't we have that with the racist comments and the hostile behavior? No, Your Honor. Again, the stray comments many years before were unconnected to a... They were out many years before. Wasn't the Nasty White Boys right around the same time? Well, at least it could be as little as two years, two and a fifth years before. It's pretty, it's an unusually venomous comment. I was wondering if you have any stray comments that are at that level of venom that are treated as not creating an issue. Your Honor, I would point the Court to Easel against Wolfe, Block, Schor, and Solis-Cohen from the Third Circuit in 1992, which seems to be the case that first discussed stray comments unconnected from an employment process, whether or not they can be sufficient to... What were the comments there? The comments there, Your Honor, there were a series of four comments that the employee complained about. And this was a gender discrimination case. One of the comments was that Ms. Easel was being evaluated negatively for too much involvement in women's issues, including the women's issue of part-time employment. The second instance was the fact that a male associate's sexual harassment of female employees at the firm was seen as insignificant, and Ms. Easel complained about that. The third incident was that Easel was evaluated negatively for being very demanding, in quotes, while several male associates who were made partners were evaluated negatively for lack of... I don't know if there's actually a measure for bigotry, but none of those comments seem as venomous as this. This is a particularly heinous phrase. And if it was used, directed at other bases, we'd be similarly outraged, wouldn't we? Your Honor, I think that is correct. And if it was indeed said, it is a venomous conduct. But unless it's connected with the employment process... Well, why doesn't time... I mean, correct me if I'm wrong on the facts, but I thought this was, was it late 2008, like December 2008, and then January is when everything starts up with them. Am I wrong? But this was close in time, right? This is not a 2005-2006 comment. I believe it was, Your Honor. I mean, the exact date is not in the record. It's in the Johnson administration. It was in the Johnson administration, which began in March of 2005. He was acting administrator for a period of time before that, I think January of 2005. But there's no support in the record that this was made in connection with the process. Moreover, Your Honor, I would posit that even if you have a... J.A. says that why is she hiring so many white people happened in 2008. That is a comment from Mr... And J.A. 17 says nasty white boys was January 2008. So we got those two in 2008. Your Honor, I don't know where Your Honor is reading. Oh, I've got... Oh, let me... J.A. Okay. On J.A. 17, on January 7, 2008, Higginbotham said, referred to administrator's aides as nasty little white boys, and in 2008, Mr. Spears asked Higginbotham why she was hiring Caucasians. So those are both 2008. At least there's evidence. Your Honor, I would look... So J.A. 17 is Ms. Higginbotham's or Ms. Morris's complaint, and if you read the allegation, she has a specific allegation that on January 7, 2008, Ms. Higginbotham laughingly said in a staff meeting, those white boys thought they could get away with it, referring to a case in which discrimination was found. And then there's a tag-along sentence, which is unrelated to this meeting. She also referred to the administrator's aides as little nasty white boys. And in her deposition, the government asked specifically when that comment was made, and she could not pinpoint it other than to say it was in the Johnson administration. So that January 2008 date is in her complaint, is not attributable to the nasty little white boys comment from her reading of the complaint. Moreover, in summary judgment, she can't rely on mere allegations. What about the next one in 2008? Again, that's Spears asking Higginbotham. Spears is saying, why are you hiring so many white people? Your Honor, and if we're talking about Mr. Spears now, whether or not he and his prejudices of any, acting on a proposed suspension of insubordination when it had been proposed for Ms. Higginbotham, I would just note that I don't know if that comment was, you know, the government doesn't believe that comment was made, but the government would refer to page three of its brief as well, which details the employees that were hired by Ms. Higginbotham. But Ms. Morris tries to make much weight out of both sides of this argument. She wants to argue that she was the only white person in the department, and thus used some sort of cherry-picked statistical argument that she was being singled out as a white person. And then separately, she wants to argue that, well, there were a lot of Caucasian hirings by Ms. Higginbotham, and that was questioned by Mr. Spears. You know, factually, those don't seem to be, those seem to be mutually exclusive. But the hirings by Ms. Higginbotham that are in the record, and again, these are the cherry-picked examples, I think, that Ms. Morris interjected into the record. There's no robust statistical analysis for this court to rely on statistics to show some sort of pattern of discrimination. But Ronald Ballard was a, was Caucasian. He was elected to serve as assistant director at the same level as Ms. Morris. Mr. Hague was Caucasian and elected to serve as regional accommodations coordinator. Ms. McCain, an African-American, was selected to work as the, on the Title VII team. Jonathan Newton, an African-American, was to serve as minority academic coordinator. Gordon Shishler, Caucasian, to serve on, as the deputy director for OCR. And Natalie Twyman, as African-American, served in the district, in the department as well. I would say factually, it's, you know, these comments aren't connected to the employment decision. She has to show a reason to question that this decision was taken. What about her other reason, and that's that Ms. Higginbotham couldn't make a, kept making up more and more stories about why she wasn't doing the response that she had promised to make. Well, I think in our brief, we lay out that those stories, that those, the version of the events, it did, it was an evolving reason why she wasn't responding to it. At first, her- Well, you say evolving. A jury could say inaccurate or false. But it's not material. It was evolving because you kept doing one, and then that didn't work, and then you came up with another one, and that one didn't work. How is it material? It's not material, because the direction was to Ms. Morris not to respond. Whether a manager decides to put off an employee to try to cool things down when there's an interpersonal disagreement between two employees, and even if those reasons are changing over time, and even if they're false, and we think that they were just evolving based upon the press of Ms. Higginbotham's demands, but even if they're false, made up, white lies to say, don't worry, I'll get to it, that doesn't change the directive to the employee not to respond. And, in fact, it may be good management skills to- and they would say, look, she's been out to get Ms. Morris all along, I guess they would say because she's white, and look what happens. Something terrible happens like this, and she keeps saying, I'll respond, but she doesn't respond. And then when you say, why don't you respond? She makes up ridiculous reasons no one could believe. They're not credible reasons, and she does it. She lies again and again and again and again. So why should you trust her on this? That's their story. I'm just laying it out for you. I'm not subscribing one way or the other. Why isn't that something a jury could conclude? And, therefore, why should I trust her? She's looking for a reason, and then she got a reason. She knew this wasn't a response. It was a different type of filing altogether. The vast majority of the content is about different issues. Your Honor, because it simply is not a reasonable read that it's a material issue as to why she didn't respond. And simply because someone told a white lie once or a lie once, an outright blatant, significant lie, unconnected with these facts, the material facts of this decision. She's going to have them tell me there were multiple ones here. It wasn't one. And I guess I'm asking you, I'm just trying to figure out that line for, it's a pretty deferential standard, what a reasonable jury could credit and why you're over that hurdle. Well, but it's a differential standard to the material facts. And if it's not material, it's not material why Ms. Higginbotham didn't respond. But the material question is, did Ms. Higginbotham consider Ms. Morris' issue sheet a response? Which Mr. Spears agreed with. An impartial arbiter, after hearing from Ms. Morris and her counsel, agreed with. I don't think that there's any reasonable inference from the facts in the record that Ms. Higginbotham's belief wasn't sincerely held. If there are no other questions, EPA asks this panel to refer. Thank you very much. The charge of insubordination requires not only that Ms. Higginbotham believe that the memo was a response, but she also has to believe that Ms. Morris understood her order to preclude what she was doing. In other words, you can't accuse your subordinate of disobeying an order if your subordinate is telling you, well, I didn't think that's what you meant. I don't think that... You clearly overstated that. The subordinate may be telling you. You may reasonably regard what the subordinate tells you as nonsense. Okay. So then what we have to look at is whether a jury looking at the response that Ms. Morris gave could think it's really true that Ms. Higginbotham, who has made these racial statements and who has been dishonest about other material facts, really thought that Ms. Morris was being dishonest when she said, I didn't respond, I don't consider this a response, I don't see how I violated your direct order. Am I right that the Johnson administration term went into 2009? Yes, but... I'm trying to get the years on the Johnson term. But it was before the suspension that those comments were made. No, I understand, but we all think Johnson, and that must be very old, but in fact it's fully consistent with these being 2008 comments. Right, because the facts are so old. The suspension is in 2007-2008 time period. And the other thing I wanted to say about the termination claim, when a judge tells you, look, I'm inclined to put off the hearing, I want to dismiss with prejudice, and then you respond, well... Where did the judge say that? Where did the judge say, I'm inclined... I thought that was part of what you requested, but I couldn't put my finger on it. Before the responses, there's a proposal to dismiss without prejudice. So the MSPB judge is proposing, she's the one proposing to put things off. Now, in Ms. Morris... Would I have... Do you have that? I don't know if we have that. What I have is in the order they say, by order dated October 14, 2010, I requested responses from the parties on the question of whether to proceed with the scheduled hearing. Right, and maybe... Or dismiss the appeal without prejudice to refiling. So that doesn't sound to me like I'm inclined. But we need the October 14 proposal. Okay, so do you have that in your record on appeal? I do not. I don't think so. I mean, the order, the October 14 order was an order, and this is coming from the response by Ms. Morris, was an order proposing dismissal without prejudice. So I think that indicated to Ms. Morris that that's what the MSPB judge was inclined to do. If you've got a judge indicating that they want to delay, and you... And maybe agree is not the right word, but she kind of submits... Okay, if that's what you want to do, go ahead and do it. Well, she's represented by a lawyer at this point, so... She is, yes. I think it's a bit much to say... I will tell you, if I had a judge who wanted to put off a hearing, I would agree to put it off generally, because the judge is not going to rule for you if they're wanting to put it off, and then you're like, no, I don't want you to put it off, because they think it should be put off. So why would you go against the judge who's going to be the fact-finder? It's not like a district court case where the jury's going to decide the issue. So I think that may have been a strategic decision to just not agree, but just... Can you provide us with a copy of that order? I can find that, yes. The MSPB e-file system is very difficult, but I'll find it. So I think when you consider the issue of Ms. Higginbotham's statements, her dishonesty about facts, whether they're material or... They're material, they're not the actual reason, but they are related to important facts about how she treated Ms. Morris, and her explanations are just, I mean... I think we have your argument. Thank you very much. Thank you. Thank you.
judges: Griffith, Millett, Williams